IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2026 Session

## JRS DEVELOPMENT, LLC v. ALAA JWAAD ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 21-1067-II        Anne C. Martin, Chancellor**

————————————————————

**No. M2025-00231-COA-R3-CV**

————————————————————

This appeal involves a breach of contract action for specific performance of a commercial real estate purchase and sale agreement. The plaintiff buyer brought suit after the defendant sellers refused to convey the property due to a dispute over a mandatory tax withholding. Following a bench trial, the trial court awarded the buyer specific performance and attorney's fees. The trial court found that the sellers were bound by the agreement because, even though their real estate agent had appended their electronic signatures without contemporaneous authorization, they later ratified the transaction. The trial court further concluded that the sellers' total refusal to close constituted an anticipatory repudiation, thereby excusing the buyer's lack of formal tender of the purchase price. The sellers appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Dana C. McLendon III, Franklin, Tennessee, for the appellants, Alaa Almuhsan Jwaad, Meaan Almuhsan Jwaad, Qutaiba Ghazi Aljanabi Abdulrahman, and Abdulkader Ghazi Aljanabi Abdulrahman.[1]

Sarah M. Ingalls, Nashville, Tennessee, for the appellee, JRS Development.

---

[1] Given shared last names, to avoid confusion, we refer to the sellers individually by their first names. We intend no disrespect to any of these individuals by the use of first names.

# OPINION

## I.

In 2020, Alaa Jwaad, Meaan Jwaad, Abdulkader Abdulrahman, and Qutaiba Abdulrahman (collectively, Sellers), foreign nationals residing in Iraq and the United Arab Emirates, decided to sell undeveloped land they owned in Davidson County, Tennessee. Because they lived overseas, Sellers relied upon a friend residing in the United States to connect them with a Tennessee real estate broker, Hussein Alnuaimi, to list the property.

On January 29, 2021, an initial Purchase and Sale Agreement (PSA) was executed for a purchase price of $600,000. The original buyer was Iron Gate Enterprises, LLC, an entity that later transferred its interest to JRS Development, LLC (Buyer), led by principal Joshua Randolph. The original PSA set a closing date of May 21, 2021, required a $20,000 earnest money deposit, and contained a provision advising Sellers that, as foreign nationals, they would be subject to a tax withholding at closing under the Foreign Investment in Real Property Tax Act (FIRPTA).[2]

Following the execution of the PSA, Buyer's engineers discovered sinkholes and other geotechnical concerns on the property, necessitating additional time for inspections and subdivision approvals. The parties negotiated three subsequent amendments. Under the terms of the original PSA, Buyer's initial earnest money deposit would become non-refundable upon the expiration of a 30-day inspection period. Due to delays in obtaining Sellers' signatures on the proposed amendments extending this deadline, Buyer formally issued notices of termination immediately prior to the expiration of the inspection periods to preserve its right to the deposit. Mr. Randolph testified that these notices were a safeguard to prevent the forfeiture of the earnest money while he awaited Sellers' signatures. He maintained that at all times he remained interested in purchasing the property. The three amendments include the following modified terms. Amendment 1, dated March 4, 2021, formally substituted JRS as the buyer and added three adjacent parcels to increase the total land size from approximately seven acres to approximately twelve acres. Amendment 2, dated April 2, 2021, extended the closing date to September 30, 2021. Amendment 3, dated May 7, 2021, required JRS to deposit an additional $30,000 in earnest money, bringing the total deposit to $50,000, and made the agreement contingent upon Buyer receiving subdivision approval from the Metro Planning Commission.

Mr. Alnuaimi affixed electronic signatures to these amendments on behalf of Sellers. Mr. Alnuaimi testified that he utilized a Microsoft screen-share program called Quick Assist to obtain authorization during phone calls with Qutaiba Abdulrahman.

---

[2] FIRPTA generally mandates that a purchaser of a United States real property interest from a foreign person must withhold a tax equal to fifteen percent of the total amount realized from the disposition. *See* 26 U.S.C. § 1445(a).

However, cyber investigation testimony at trial established that the IP addresses for all of the electronic signatures traced back to Mr. Alnuaimi's physical office in Nolensville, Tennessee. To resolve this conflicting testimony regarding the execution of the amendments, the trial court examined the contemporaneous communications between the parties. Because Sellers resided overseas, they corresponded with Mr. Alnuaimi using a messaging application called WhatsApp. These communications, which consisted of both written texts and audio messages in Arabic, were translated into English and entered into evidence. In assessing the conflicting testimony regarding these events, the trial court found that Sellers' "[d]eposition testimony was adversarial, confusing, evasive, and inconsistent with the written communications from Sellers." Regarding the WhatsApp messages, the trial court noted that "although the Sellers, in their depositions for evidence, were inconsistent regarding what they knew and when they knew it in relation to the transaction, and [Mr.] Alnuaimi's testimony was inconsistent about the obtaining of electronic signatures, these records speak for themselves." Ultimately, the trial court concluded that "it is more likely than not Sellers did not authorize Alnuaimi to append their electronic signatures to Amendments 1, 2, and 3."

Despite the finding regarding lack of authorization, the record demonstrates that Sellers' designated representative, Qutaiba, communicated regularly with Mr. Alnuaimi via the WhatsApp messaging application throughout the spring and summer of 2021. Qutaiba specifically informed Mr. Alnuaimi, "I represent all the owners. You can contact Essam to verify this."[3] On May 24, 2021, Mr. Alnuaimi sent a copy of the Amendment 3 to Qutaiba, who subsequently requested a full electronic copy of the contract. After receiving it, Qutaiba approved of the agent's actions, sending an audio message stating: "Good job! I only knew about it yesterday. Go ahead, and everything will be fine. Hopefully, the sale will be handled by you. We'll be happy if the sale is done through a true Iraqi man like you!" In another message, Qutaiba further acknowledged the extension, stating: "We want to sell the land plot. So, the extension is no problem. The Covid outbreak affected everyone, so it's normal. This contract has been extended. You said you had sent it, e-signed. No problem." In later communications leading up to September, Qutaiba again acknowledged the extended deadline. On September 1, 2021, after Mr. Alnuaimi informed Qutaiba that Buyer's subdivision and construction approvals had been granted, Qutaiba texted Mr. Alnuaimi: "Please brief the Buyer that he must make full payment for the land, as set in the Contract, within this month. By virtue of the final extension agreement, the deadline is 9/30/21." Additionally, on September 3, Qutaiba provided passport copies to Mr. Alnuaimi to facilitate the preparation of the power of attorney documents necessary for closing.

In September 2021, as the closing approached, Mr. Alnuaimi and Sellers' title attorney, Kim Hollingshead, reminded Qutaiba that 15% of the purchase price would be

---

[3] Essam was a friend of Sellers residing in Miami, Florida, who initially connected Sellers with Mr. Alnuaimi to facilitate the listing of the property.

withheld for the IRS pursuant to FIRPTA because Sellers lacked U.S. citizenship and Social Security numbers. Upon being told that this tax would be enforced, Sellers objected. On September 13, 2021, Sellers' title attorney transmitted Power of Attorney and wire authorization forms to Sellers for execution to allow their locally residing sister to close on their behalf. On September 14, 2021, Qutaiba messaged Mr. Alnuaimi to state that "the sellers have agreed not to pay that 15% tax." He subsequently told Mr. Alnuaimi, "If there is not [an] alternative to the 15% tax, we won't proceed with the sale." Consequently, Sellers refused to execute the necessary powers of attorney or closing documents.

Because Sellers' title company never received the executed powers of attorney, it was unable to close the transaction or furnish wiring instructions to Buyer. On September 29, 2021, Mr. Randolph texted Mr. Alnuaimi regarding the closing status, and Mr. Alnuaimi replied that they were waiting for the Power of Attorney documents to arrive by mail from overseas. Buyer indicated its readiness to perform. Mr. Randolph testified, "[W]hat we do is wire our funds to the title company. The title company then cuts a check to the seller. So all of that was in progress." However, Sellers' title attorney confirmed that a formal tender of funds would have been futile without Sellers' executed documents. She testified, "[N]o, we didn't have a power of attorney. . . . I have to, as the attorney issuing the title insurance policy, review the power of attorney. I need to have the original in the office so I can have it recorded as well." Additionally, the title attorney confirmed that her office required a completed wire authorization and W-7 form to close the transaction, neither of which was executed by Sellers. Without instructions from the title company, Buyer did not tender the purchase price on the September 30, 2021 closing date.

On October 5, 2021, Mr. Alnuaimi notified Buyer that Sellers did not intend to close, and Buyer filed suit for specific performance on October 26, 2021. Sellers filed an Answer and a Third-Party Complaint against Mr. Alnuaimi alleging fraud and forgery, though they voluntarily nonsuited the claims against Mr. Alnuaimi prior to trial. During the litigation, the trial court denied Sellers' motion for summary judgment, determining that a genuine dispute of material fact remained regarding whether Buyer's formal tender of the purchase price was legally excused because of futility. The trial court later denied Sellers' subsequent Rule 54.02 motion, electing not to exercise its discretion to revise the order because the motion merely sought to relitigate matters that had already been adjudicated. Following a two-day bench trial in September 2024, where Sellers did not appear in person and relied instead on deposition transcripts and the expert testimony of cyber-investigator Robert Young, the trial court entered a final order in favor of Buyer.

The trial court held that, despite the unauthorized electronic signatures, Sellers ratified the amendments through Qutaiba's fully informed adoption of the contract. The trial court further held that Sellers breached the valid contract by failing to close, awarded Buyer specific performance, and granted Buyer its reasonable attorney's fees pursuant to the purchase agreement. In a later order, the trial court awarded Buyer $91,360.38 in attorney's fees.

Sellers appealed, presenting four issues on appeal:

1. Did the trial court err by declining to grant the appellant's summary judgment motion?

2. Did the trial court err by finding that the purchase and sale agreement was enforceable by the buyers?

3. Did the trial court err by applying a common law remedy contrary to the applicable statute?

4. Did the trial court err by ordering specific performance?

Buyer raises a fifth issue, asserting an entitlement to appellate attorney's fees.

II.

Following a bench trial, as here, we review the trial court's findings of fact "de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 552 (Tenn. 2024) (quoting *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d))). Review of a trial court's determinations on questions of law is "de novo with no presumption of correctness accorded to the rulings of the courts below." *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025); *see Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

III.

Sellers first contend that the trial court erred in denying their pre-trial motion for summary judgment. In denying the motion for summary judgment, the trial court expressly determined that "there are material facts in dispute."

This court has observed that

Summary judgment is a procedural mechanism for avoiding the time and expense of trial by concluding cases that can be resolved on dispositive legal issues alone. When a trial court denies a motion for summary judgment based on the existence of disputed material facts, the denial is not appealable after a trial on the merits.

*In re Est. of Link*, 542 S.W.3d 438, 453 (Tenn. Ct. App. 2017) (citations omitted); *see also, e.g.*, *Smith v. Benihana Nat'l Corp.*, 592 S.W.3d 864, 869 (Tenn. Ct. App. 2019) (noting that "when a motion for summary judgment is denied on the basis that disputed material

- 5 -

facts exist, the denial of that motion is not appealable after a trial on the merits has occurred"). Accordingly, Sellers' challenge to the trial court's denial of their motion for summary judgment is barred from appellate review.

IV.

Turning to the substantive merits of the trial court's final judgment, Sellers assert that the trial court erred in finding them bound by the PSA amendments. Under the principles of agency law, while a principal is not bound by the contracts of an agent acting beyond the scope of his or her actual authority, an unauthorized contract becomes binding if the principal ratifies it. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269-70 (Tenn. 2001). "Ratification can . . . be described as 'the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another who assumed to act as his agent without authority so to do.'" *Kelly v. Stewart*, No. M2024-00296-COA-R3-CV, 2025 WL 1156914, at *3 (Tenn. Ct. App. Apr. 21, 2025) (quoting *Webber*, 49 S.W.3d at 270). "[B]efore ratification of an unauthorized transaction will be considered valid and binding, the principal must have full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction." *Corp. Flight Mgmt., Inc. v. Tal Aviation, S.A.*, No. M2018-01492-COA-R3-CV, 2019 WL 4052493, at *7 (Tenn. Ct. App. Aug. 28, 2019) (quoting *Webber*, 49 S.W.3d at 270). The issue of ratification is usually a question of fact because it is dependent on the principal's intent. *Webber*, 49 S.W.3d at 270.

Sellers' attack on the trial court's ratification finding stands upon two pillars. One, Sellers argue that the Tennessee Real Estate Broker License Act (TREBLA) shields them from liability for their real estate agent's unauthorized appending of their electronic signatures. To the extent TREBLA applies, Sellers' argument is unpersuasive. Under Tennessee Code Annotated section 62-13-407, a client of a licensed real estate broker "shall not be liable for damages for the misrepresentations of the licensee arising out of the licensee's services unless the client or party knew or had reason to know of the misrepresentation." Tennessee Code Annotated section 62-13-408 provides that the provisions of TREBLA "shall supersede common law to the extent common law is inconsistent with this part." Sellers contend that because their agent improperly affixed their electronic signatures without contemporaneous authorization, section 407 preempts the common law doctrine of ratification and renders the PSA unenforceable.

However, section 407 contains an exception: the liability shield does not apply if the client "knew or had reason to know of the misrepresentation." Tenn. Code Ann. § 62-13-407. Because of this exception, if a principal acquires knowledge of the unauthorized act and chooses to adopt it, the application of the common law doctrine of ratification is consistent with, and not superseded by, TREBLA pursuant to section 408. Tenn. Code Ann. § 62-13-408.

- 6 -

By acquiring knowledge of the agent's unauthorized electronic signatures and affirmatively adopting the amended contractual changes rather than disavowing them, Sellers placed themselves squarely within the "knew or had reason to know" statutory exception of section 407. Therefore, the trial court correctly held that Sellers, through their authorized representative, acquired full knowledge of the material facts of the transaction and subsequently ratified the unauthorized amendments to the PSA. Because Sellers knew of and adopted the amendments, their conduct defeated the statutory liability shield of TREBLA, insofar as it applies in this situation, rendering the contract valid and enforceable under the common law doctrine of ratification.

As for their second pillar, Sellers contend that the PSA is unenforceable as a matter of law because Buyer failed to tender the $600,000 purchase price by the September 30, 2021 closing deadline. It is well-established in Tennessee that "[w]here a seller and buyer contract for a sale of realty to be consummated within a specified time, the obligations of the parties are reciprocal, and either, in order to compel performance by the other, is bound to comply or exhibit readiness to comply with his own contractual undertaking." *Lafferty v. Pate*, No. 01A01-9303-CH-00085, 1993 WL 312682, at *3 (Tenn. Ct. App. Aug. 18, 1993) (citing *Williams v. Title Guar. & Tr. Co.*, 212 S.W.2d 897 (Tenn. Ct. App. 1948)). Consequently, to maintain an action for breach of contract, "the purchaser must show a good faith performance or offer of performance on his part." *Id.* (citing 92 C.J.S. Vendor & Purchaser, § 580, pp. 620, *et seq.*).

However, the requirement of formal tender is not absolute. The actions of a seller can obviate the need to tender the purchase price when it is clear that such an act would have been futile. *Id.* at *4 (noting "the actions of the purchaser can obviate the need for tender of a deed when it is clear that such an act would have been futile"). Futility may be established through the doctrine of anticipatory repudiation. Howard O. Hunter, *Modern Law of Contracts* § 10:9 (2025) ("Anticipatory repudiation by the other party is one example of futility."). Anticipatory repudiation occurs when "the words and conduct of the contracting party . . . amount to a total and unqualified refusal to perform the contract." *St. George Holdings LLC v. Hutcherson*, 632 S.W.3d 515, 526 (Tenn. Ct. App. 2020) (quoting *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991)).

Sellers argue that because Buyer was unaware of Sellers' final refusal to close until October 5, 2021—five days after the deadline had passed—Buyer cannot rely on the doctrine of anticipatory repudiation to excuse its lack of tender on September 30. However, Sellers' own refusal to execute the closing documents paralyzed the transaction. Under Tennessee law, "a party responsible for the delay should not be thereby enabled to avoid damages for the breach of the unperformed contract." *Lafferty*, 1993 WL 312682, at *2. Tennessee law excuses formal tender when the opposing party's actions make it clear that such an act would be futile. *Id.* at *4. Here, Sellers' failure to execute the requisite documents prevented the closing, making tender futile regardless of exactly when Buyer learned of Sellers' objection to the FIRPTA tax. Because the transaction could not legally

proceed without the executed power of attorney and wire instructions, any tender by Buyer on September 30 would have been an exercise in futility.

Sellers' own title attorney testified that her office needed a completed wire authorization and W-7 to close the transaction, neither of which was executed by Sellers. Furthermore, she required the original, executed power of attorney from Sellers in her office so that she could review it, issue the title insurance policy, and properly record it. She also testified that she could not furnish wiring instructions to Buyer's title company without these executed documents, making the transaction impossible to complete on the September 30 deadline. Consequently, any formal tender of the $600,000 purchase price by Buyer would have been futile, as the transaction could not have closed on the closing date because Buyer never received instructions to wire the funds.

When a seller's anticipatory repudiation excuses a buyer's formal tender, the buyer must still demonstrate a readiness and ability to perform but for the seller's breach of contract. *Maness v. Collins*, No. W2008-00941-COA-R3-CV, 2010 WL 4629614, at *9 (Tenn. Ct. App. Nov. 17, 2010) (noting "the plaintiff may recover *on the contract* provided it is proved that plaintiff would have been ready, willing and able to perform but for the prevention" (quotation omitted)); *see also Ching-Ming Chen v. Advantage Co.*, 713 S.W.2d 79, 81 (Tenn. Ct. App. 1986).

The trial court found JRS met that burden. Mr. Randolph testified that Buyer had secured all necessary funding and was in active communication with the title company regarding closing logistics. The trial court credited this testimony, noting that Mr. Randolph was "blindsided" by Sellers' refusal to close over the FIRPTA tax dispute. Sellers attempt to undermine this demonstrated readiness by arguing that Buyer acted inconsistently by issuing termination notices during previous extension negotiations but failing to do so on the final closing date. However, the record establishes that these prior notices were precautionary measures utilized by Buyer to protect its earnest money while awaiting Sellers' delayed signatures, not an indication of an unwillingness to close. That Buyer protected its contractual rights during the inspection period does not negate its readiness to perform on the September 30 deadline. The trial court's factual finding that Buyer remained ready to perform is supported by the record. *See Mathes*, 696 S.W.3d at 552. We conclude that the trial court did not err.

V.

Sellers' final substantive challenge asserts that the trial court erred in awarding the equitable remedy of specific performance. "The question of whether a contract should be specifically performed depends upon the facts of each case, and is a matter addressed to the sound discretion of the trial court." *McBride v. Allison*, No. E2024-00037-COA-R3-CV, 2024 WL 4481508, at *5 (Tenn. Ct. App. Oct. 14, 2024), *perm. app. denied* (Tenn. Mar. 23, 2025) (citing *Hillard v. Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000)). In

Tennessee, "specific performance of a contract is not available to a party as a matter of right, but rests in the sound discretion of the [trial court] under the facts appearing in the particular case." *Am. Bd. of Craniofacial Pain v. Am. Bd. of Orofacial Pain*, 633 S.W.3d 598, 605 (Tenn. Ct. App. 2020) (quoting *North v. Robinette*, 527 S.W.2d 95, 98 (Tenn. 1975)) (alterations in original). "Specific performance is not available unless the contract is clear, definite, complete, and free from any suspicion of fraud or unfairness." *Kitzmiller v. Kitzmiller*, No. E2023-01834-COA-R3-CV, 2025 WL 2387919, at *4 (Tenn. Ct. App. Aug. 18, 2025) (quoting *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990)).

While Sellers correctly identify the general rule that a contract must be free from the suspicion of fraud, their argument ignores both the trial court's factual findings and the effect of their subsequent ratification. First, the trial court held, "The Court makes no finding of fraud in this case." The trial court concluded that while the electronic signatures were initially affixed without contemporaneous authorization and prior deadlines were not disclosed, "any purported misrepresentation or fraud had no effect once Qutaiba Abdulrahman became aware and ratified the transaction on Sellers' behalf."

Additionally, the trial court reached a conclusion as to Sellers' actual motivation for breaching the agreement that was separate and distinct from the purported fraud. Relying upon the parties' communications, the trial court found that "there was no suspicion of fraud as the record demonstrates that Sellers changed their minds about selling the Property after discovering the 15% tax." From the record, there is ample evidence to support the trial court's conclusion that Sellers were aware of the amendments and the terms of the contract.

In light of the trial court's determinations, the Chancellor properly concluded that "Sellers breached the PSA" and that "the Court finds JRS is entitled to specific performance for the sale of the Property pursuant to the terms of the valid, enforceable PSA." Because the trial court correctly determined that Sellers ratified the amendments with full knowledge of the material facts, that ratification cured the initial defect in the execution of the amendments. *Wells v. Holley*, 235 S.W. 430, 433 (Tenn. 1921). Consequently, the trial court did not abuse its discretion in awarding specific performance to Buyer.

VI.

Finally, Buyer requests attorney's fees incurred in responding to this appeal.[4] The parties' executed PSA contains an unambiguous fee-shifting provision. The contract

---

[4] Sellers also contend that the trial court erred in awarding attorney's fees to Buyer, basing its argument on the premise that the underlying contract is unenforceable. Because we have affirmed the trial

provides: "In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees." When a valid contract contains a fee-shifting provision that entitles the prevailing party to recover reasonable attorney's fees, the prevailing party is contractually entitled to recover those fees incurred on appeal. *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017). Further, appellate courts must enforce those contractual rights. *Id.*

Buyer has successfully defended the trial court's judgment on appeal and remains the prevailing party. As such, Buyer is contractually entitled to an award of its appellate attorney's fees, and the matter must be remanded for a calculation of those reasonable fees.

VII.

For the aforementioned reasons, we affirm the judgment of the Chancery Court for Davidson County. Costs of this appeal are taxed to the Appellants, Alaa Jwaad, Meaan Jwaad, Qutaiba Abdulrahman, and Abdulkader Abdulrahman, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____<br>JEFFREY USMAN, JUDGE

---

court's determination that the PSA is valid and enforceable through the doctrine of ratification, Sellers' challenge to the trial court's award of attorney's fees is without merit.